## Commonwealth v. Leet

*George Kepple, district attorney,* for the commonwealth.

*Joseph F. Canuso,* for defendant.

HOUSE, *P. J.,* February 27, 1989—In this case we must confront an issue of considerable interest and importance. Does a deputy sheriff have legal power to make a traffic stop and/or arrest? We agree with the commonwealth that, in general, law enforcement authorities have such powers as are granted them by statute. In the case of sheriffs and their deputies, however, there are no statutes which specifically define the duties of or powers exercisable by such officials. In the absence of statutory authority, the sheriff's police powers, if any he has, must of necessity be based upon the common law. Historically, the sheriff has been a most important figure and, in medieval England, that officer was described as "the principal conservator of the peace within his bailiwick."

The office of sheriff, as it has evolved through the centuries, has had two primary functions: First, there has been the above-mentioned function of the keeping of the public peace and order and, second, the still-evolving function of action as an arm of the courts by serving the court's process, executing and

enforcing the court's orders, taking custody of the court's prisoners and providing security for the court's operations.

Insofar as the sheriff's duties in connection with the courts are concerned, there can be no doubt whatsoever that the sheriff and his deputies do have the power (derived from the court itself) to enforce the court's directives by stop and arrest at least where violation of the directives occurs in the presence of the sheriff and/or his deputies. Likewise, there can be little doubt that the sheriff and his deputies retain their historic powers as peace officers, that is, the power to stop and/or arrest where breaches of the public peace or public order occur in the presence of such officers or concerning which they have reliable information.

*Bouvier's Law Dictionary* (Francis Rawle's 3d Revision) 8th ed., West Publishing Co. (1914) contains a rather comprehensive discussion of the office of sheriff and of powers of arrest generally.

Bouvier indicates that "any peace officer...sheriff...may without a warrant arrest any person committing a felony in his presence;...or committing a breach of the peace, during its continuance or immediately afterwards;...whether acting on his own knowledge or facts communicated by others ...and not unless the offense amount to a felony." *Bouvier* at 243.

Bouvier quoting others states that in feudal times the sheriff "grew to be the ruler of the country, responsible for its revenues, military force, police, gaols and courts, and the execution of the writs of the *Curia Regis*." *Bouvier* at 3058. But Bouvier goes on to outline the later history of the office in which most of the above powers waned and/or were stripped away and the sheriff had evolved into "an attendant of the courts of law." Indeed Bouvier

quotes Maitland as stating that "the whole history of English justice and police might be brought under this rubric — the Decline and Fall of the Sheriff."

Thus, it is quite safe to conclude that the sheriff's office which crossed the ocean and was embedded in the Pennsylvania Constitution was a much less powerful and comprehensive office than that which existed in England in the early centuries after the Norman Conquest.

Bouvier ascribes to the sheriff the power "to pursue and to take all traitors, murderers, felons and rioters" and states that it is the sheriff's duty "to preserve the peace within his bailiwick or county."

Thus, it does appear that the office of sheriff, at the time of its enshrinement in the Pennsylvania Constitution, carried with it the power to arrest for felony violations as well as for breaches of the peace.

At the time of the initial adoption of our constitution, virtually all felonies were then common-law felonies as opposed to statutory felonies. Today, by statute, all common-law felonies have been abolished and we now have nothing but statutory felonies. Thus, a question exists as to whether the sheriff's powers to arrest for felony still survives. However, that question is not before us and we do not decide it.

Neither *Bouvier, supra,* nor any other source we have been able to find attributes to the sheriff the power to arrest on view or upon information for misdemeanor offenses or for statutory offenses of any description.

"Peace officer" is defined in Webster's New International Unabridged Dictionary (2d ed.) as "A civil officer whose duty it is to preserve the public peace, as a *sheriff* or constable. *Policemen are made peace officers by statute.*" (emphasis supplied)

By contrast, "police" is defined, inter alia, as: "the department of government charged with the prevention, detection, and prosecution of public nuisances, crimes, etc."

While there may be room for controversy, it does appear that there is an historic and fundamental difference between the duties and functions of sheriffs and the duties and functions of police.

The Pennsylvania Constitution in Article 9, section 4 provides that county officers shall include, inter alia, "sheriffs." However, neither the constitution nor statutes define "sheriff" or the powers of the office.

Under the Pennsylvania Constitution the legislative power is vested in the General Assembly. That body has seen fit to enact statutes which create or authorize the creation of state and municipal police departments. The General Assembly has further selected these police arms so created by it to be the enforcers in the execution of the laws enacted by it. Perhaps by inadvertence, but almost certainly by design, the General Assembly has never seen fit to enact legislation either defining the sheriff's powers or specifying that the sheriff shall have general police powers insofar as statutory enactments are concerned.

The commonwealth argues in the case at bar that the sheriff has common-law police powers but, as shown above, we do not have an exclusively common-law government. Ours is a constitutional government and the powers granted to the branches of that government are therein defined. The constitution taken together with the lawful enactments of the legislature constitute the "policy" of the commonwealth and the "police" are the designated enforcers of that "policy." It is, thus, no accident that these two words "policy" and "police"

are from the same word root and that, indeed, in earlier times they were used interchangeably.

Obviously, since the police are but creatures of the legislature, they can have and exercise only those powers delegated to them by legislative enactment. Thus, the conclusion seems compelled that in Pennsylvania, at least, the powers of police officers are purely statutory. Does this mean that there are and can be no "common-law" police powers?

Pennsylvania unquestionably is a common law state in the sense that Pennsylvania has always considered that its body of law incorporates the so-called English common law. But that does not mean that the powers wielded under feudal English common law by the lord of the manor or local knight or sheriff are now necessarily to be attributed to the modern counterparts of those ancient officers. The lord of the manor, the knight and the sheriff all then had a hand in maintaining peace and order and in enforcing the "law," i.e. the king's will. Today the lord of the manor sits in Parliament and knighthood is an honorarium in England and a justice of the peace in America. Only the sheriff survived the trans-Atlantic crossing and, then, apparently only in his capacity as a peacekeeper and as an executor of the court's process. In examining the whole history of this commonwealth, we have not found nor have we been shown that the office of sheriff in Pennsylvania has ever claimed or historically exercised general police powers — that is, powers to enforce statutory enactments as opposed to peacekeeping powers.

These who argue that the medieval sheriff may have had general arrest powers overlook the fact that the English common law was never a fixed and static thing. Over the centuries the common law

evolved and, presumably, continues to evolve in the land which gave rise to it.

In any event, it is not the English common law as it existed at the time of King John and Magna Carta that has been incorporated into our body of law in Pennsylvania. Rather, it is the English common law as it existed at the time of our Declaration of Independence in 1776 to which we must look for guidance and common-law precedent.

As we observed above, we are aware of no then-existing common law precedent for general arrest or police powers in a sheriff although it is clear that the sheriff retained his historic peacekeeping powers and power to arrest for felony.

The Vehicle Code contains an "Enumeration of police powers" at 75 Pa.C.S. §6109 and also contains a provision as to who may arrest without a warrant at 75 Pa.C.S. §6304. The first of these sections of the code (section 6109) refers to the delegation to local municipalities of the power to enact local laws or regulations as to certain traffic matters. It does not relate to police or peace officers as such. The latter section (section 6304) sets out that the code is to be enforced by the Pennsylvania State Police; by "other police officers" in some cases; and preserves any powers of arrest "conferred by law."

As we have demonstrated, the sheriff and his deputies are not police officers and we can find no statutes otherwise bestowing upon them the powers of arrest for violations of statutes in general or for violations of the Vehicle Code in particular.

It should be noted that, while the Crimes Code itself is silent as to who has the power to arrest for violations of its provisions, it does provide that all common-law crimes are abolished (18 Pa.C.S. §1079G). Both the Vehicle Code and the Crimes

Code appear to be complete statutory schemes which completely cover their subject matter so as to leave no room for other common-law offenses or common-law enforcement powers.

The only published Pennsylvania case we have found or which we have been cited to, which attributes criminal investigation powers to the office of sheriff is *Miller v. Klunk,* 15. D.&C. 3d 599 (1980), an Adams County case, which was concerned with financial matters and not with the issue of the arrest powers, if any, of the sheriff. *Miller* simply does not bear upon the issue before us.

The case of *Commonwealth v. Shoop,* 108 Dauphin Rep. 426 (1988) involved the arrest or attempted arrest by two deputy sheriffs of an election official. In that case, our sister court directly concluded that the deputies were not "police officers" and, in support thereof cited *Venneri v. County of Allegheny,* 12 Pa. Commw. 517, 316 A.2d 120 (1974); *Allegheny County Deputy Sheriffs Association v. Pennsylvania Labor Relations Board,* 95 Pa. Commw. 132, 504 A.2d 437 (1986), as well as other Commonwealth Court cases. While the Commonwealth Court cases cited above have been concerned with labor relations issues involving sheriffs and their deputies, they, together, rather exhaustively review the history and traditional powers of the office of sheriff and, tacitly, conclude that sheriffs and their deputies are peace officers and not police officers.

The commonwealth cites a passage in the lower court's opinion in *Commonwealth v. Venneri,* 121 Pitts. Leg. J. 366 (1973) as support for its position that sheriffs and their deputies have general arrest powers. That case relates to the sheriff of Allegheny County and his employees and the opinion openly states that it was the "present sheriff" who "resu-

scitated" the ancient powers of the office in engaging "in criminal investigations" and making a total of "544 arrests." The Allegheny County Court found this very recent activity "to be entirely proper and not subject to judicial restriction."

However, while we agree that the courts must not "restrict" the otherwise legitimate powers of the sheriff, the true issue to be decided here is whether, in fact and in law, the modern office of sheriff possesses general law enforcement powers so as to enable him and his deputies to make traffic stops and engage in other forms of statutory enforcement. We do not believe that the very recent activities of one or a few sheriffs in Pennsylvania casts any light on this important issue or points the way to its resolution.

We believe that in A.D. 1989, it is neither reasonable nor legally sound to ascribe to the office of sheriff powers that it may or may not have possessed in A.D. 1100 at common law in medieval Britain. The passage of many centuries in which those powers have unquestionably declined and/or went unused and/or were delegated to others by legislative enactment has effectively extinguished the sheriff's powers if, indeed, any existed at common law.

We are satisfied that the General Assembly has amply demonstrated in numerous enactments that it is fully conscious of the difference between a "peace" officer and a "police" officer. Significantly, that body has never seen fit, in all the centuries of its existence, to designate sheriffs and their deputies as "police officers" or to delegate to them any general or special law enforcement powers whatsoever.

Contrary to the commonwealth's bald assertion in its brief, moreover, the Municipal Police Jurisdic-

tion Act (Act 141; 42 Pa.C.S. §8951 et seq.) does not provide that a deputy sheriff is a municipal police officer. What Act 141 does say is that a municipal police officer is a person employed by a municipality as a police officer.

Merely because a deputy sheriff is a county employee does not mean that he becomes automatically a county police officer. Armstrong County has not created a county police force (if, indeed, it has the power to do so) and has not employed any persons as police officers. All that Armstrong County has done is authorize the hiring and compensation of sheriff's deputies.

We believe that the commissioners of Armstrong County would be quite surprised, unpleasantly so, to learn that they are or will be providing financial support to equip and man a general county-wide police force engaged in traffic patrols and criminal investigation and enforcement.

Next the commonwealth argues that, since the deputy sheriff has obtained the training required under the Municipal Police Officers' Education and Training Program, he becomes authorized to make arrests pursuant to the Municipal Police Jurisdiction Act. Once again the commonwealth is attempting to put the bunny in the hat by simply asserting that the sheriff's operation is a police department of the county and that the deputy thus qualifies as a "police officer" or "municipal police officer." But we can find no legislative enactment, county ordinance or resolution or other provision of law which designates the sheriff's department as a police department or confers upon the sheriff and his deputies the powers of police officers regardless of the training that such persons may have received.

Unquestionably, the General Assembly has the constitutional power to designate sheriffs and their

deputies as "police officers" and to endow them with full powers of statutory enforcement. And if the General Assembly sees fit to enact legislation to so empower the office of sheriff, this court would be entirely comfortable with such a result. However, it would be a usurpation of the authority of the General Assembly if we were to ascribe such police powers to the sheriff in the absence of legislative enactment.

Perhaps the legislature will soon turn its attention to the lack of any enactment defining the powers of the sheriffs and their deputies and thus end the uncertainty as to the powers of this important office.

The court invited and received an amicus curae brief in this case prepared by the Sheriffs' Association of Pennsylvania. We have considered that brief and its arguments together with the commonwealth brief in this matter. Reluctantly, but correctly we believe, we have found those arguments unpersuasive. Taken together, they seem to argue that any doubt about the sheriff's powers should be resolved in favor of the sheriff on the basis of the always difficult to define and now even more remote common law. We see it differently, however. This is a criminal case and it is defendant who is entitled to the benefit of any doubt that may exist.

An on-view traffic violation stop and/or arrest does not involve a breach of the peace. The purpose of such a stop is purely to vindicate and enforce a legislative enactment which relates to the movements of vehicular traffic on the public highways. We hold, albeit regretfully, that the deputy did not have the power or authority to stop and hold defendant for the arrival of local police. Since all of the evidence in this case flows from the unlawful stop, we hold it must now be suppressed.

## ORDER OF COURT

And now, February 27, 1989, after hearing and the submission of written argument and briefs, and for the reasons contained in the annexed memorandum, defendant's motion for suppression of evidence is granted and it is ordered, adjudged and decreed that all evidence obtained as a result of the stop/arrest of defendant by the sheriff's deputy be and now is suppressed and shall be inadmissable in any trial of defendant upon the charges brought against him in the above-captioned matter.